

# SUPREME COURT OF MISSOURI
## en banc

CITY OF AURORA, MISSOURI, et al.,     )   *Opinion issued December 24, 2019*

                )

        Respondents/Cross-Appellants,   )

                )

v.                      )   No. SC96276

                )

SPECTRA COMMUNICATIONS GROUP,   )

LLC, d/b/a/ CENTURYLINK, et al.,     )

                )

        Appellants/Cross-Respondents.   )

## APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
The Honorable Tom W. DePriest, Jr., Judge

The cities of Aurora, Cameron, Oak Grove, and Wentzville (collectively, "the Cities")[1] filed an action for declaratory judgment and injunctive relief against CenturyLink, Inc. f/k/a CenturyTel, Inc., and its subsidiaries.[2] In their petition, the Cities alleged CenturyLink failed to pay all license taxes owed under the Cities' respective ordinances since 2000. The Cities also alleged CenturyLink failed to enter into right-of-way user agreements under Cameron's and Wentzville's respective ordinances and failed to pay

---

[1] The city of Harrisonville was originally a plaintiff to the action. Its claims against CenturyLink were dismissed with prejudice after it reached a settlement agreement.

[2] The subsidiaries sued were Spectra Communications Group, LLC, d/b/a CenturyLink; Embarq Missouri, Inc.; CenturyTel of Missouri, LLC; CenturyTel Long Distance, LLC; and Embarq Communications, Inc.

Cameron's linear foot fees. The trial court entered two partial summary judgments in favor of the Cities on the issue of liability, and the case proceeded to trial on the limited issue of damages resulting from CenturyLink's delinquent and unpaid taxes to the Cities. After trial, the court entered a final judgment for the Cities and awarded damages for unpaid license taxes. The trial court also awarded the Cities attorney fees, prejudgment interest, and postjudgment interest.

CenturyLink and the Cities filed cross-appeals. CenturyLink raises nine points on appeal. The Cities raise eight points on cross-appeal. The trial court's judgment is affirmed in all respects except for the following:

The trial court erred in awarding prejudgment interest to Aurora, Cameron, and Oak Grove pursuant to section 408.020[3] because the more specific provisions in sections 71.625.2, RSMo 2012, 144.170, and 32.065 govern interest on the delinquent payment of license taxes. The trial court further erred in awarding prejudgment interest to Wentzville pursuant to its municipal ordinance because the rate of interest in its ordinance conflicts with the rate of interest provided by statutes. The trial court also erred in awarding attorney fees to Aurora, Cameron, and Oak Grove. The record does not support the trial court's finding that CenturyLink's failure to pay the Cities' license taxes was willful pursuant to sections 392.350 and 488.472. Likewise, the record does not reflect any special or unusual circumstances justifying an award of attorney fees pursuant to section 527.100 or the trial court's equitable powers. Accordingly, the award of attorney fees to Aurora, Cameron,

---

[3] All statutory citations to sections within chapter 67 are to RSMo Supp. 2012. All other statutory citations are to RSMo 2000, unless otherwise noted.

2

and Oak Grove is reversed. CenturyLink, however, did not challenge the trial court's award of attorney fees pursuant to Wentzville's municipal code. Consequently, the attorney fees awarded to Wentzville must be affirmed.

The cause is remanded. On remand, the trial court must calculate prejudgment interest in accordance with this opinion, determine what portion it's attorney fee award may be properly apportioned to Wentzville, and determine Wentzville's attorney fees on appeal.

## I. Factual and Procedural Background

In 2012, the Cities brought a declaratory judgment action against CenturyLink alleging it had failed to pay all of the required license taxes owed under the Cities' respective ordinances. The Cities further alleged CenturyLink failed to enter into right-of-way user agreements with Cameron and Wentzville and failed to pay Cameron linear foot fees under Cameron's right-of-way ordinance.

CenturyLink denied failing to pay all taxes and linear foot fees due under the Cities' respective ordinances. CenturyLink also denied being required to enter into right-of-way user agreements with Cameron and Wentzville. In its answer, CenturyLink asserted several affirmative defenses, including that the Cities' claims were barred to the extent they sought to collect tax on certain services and revenue streams beyond those permitted by the Cities' respective ordinances. CenturyLink further asserted that the grandfathered political subdivision provision under section 67.1846.1 permitting linear foot fee ordinances existing prior to May 1, 2001, was a constitutionally invalid special law and

3

that Cameron's and Wentzville's user permits or agreements created impermissible mandatory franchises for use of the public rights-of-way.[4]

The Cities subsequently filed a motion for partial summary judgment alleging all sources of revenue received by CenturyLink constituted gross receipts for purposes of calculating license taxes. The motion further alleged CenturyLink was required to comply with Cameron's and Wentzville's right-of-way ordinances. In opposing the motion, CenturyLink asserted the Cities were attempting to tax telecommunication services beyond those derived from the Cities. CenturyLink further contended Cameron and Wentzville were prohibited from requiring telecommunication companies such as CenturyLink to enter into right-of-way agreements, which it asserted were constituted mandatory franchise agreements prohibited under section 67.1842.

On April 17, 2014, the trial court entered partial summary judgment in the Cities' favor. The trial court found CenturyLink failed to pay taxes as required under the Cities' respective license tax ordinances on four types of revenue: (1) license tax pass through; (2) vertical and optional calling services; (3) end-user common-line charge and subscriber line charge; and (4) federal and state universal service funds. The trial court then awarded the damages from such revenues as were calculable and ordered an accounting as to the other identified revenues.

---

[4] Section 67.1846 defines a "grandfathered political subdivision" as "any political subdivision which has, prior to May 1, 2001, enacted one or more ordinances reflecting a policy of imposing any linear foot fees on any public utility right-of-way user, including ordinances which were specific to particular public right-of-way users."

4

The trial court also concluded that Cameron's right-of-way code is valid and enforceable and ordered CenturyLink to enter into a use permit agreement with Cameron. It further ordered CenturyLink to pay $138,914.04 in linear foot fees plus interest. The trial court similarly concluded Wentzville's right-of-way code is valid and enforceable and ordered CenturyLink to enter into a right-of-way use agreement with Wentzville.

Finally, the trial court concluded the Cities were entitled to summary judgment on their claims that CenturyLink's failure to fully report all of its gross receipts was unlawful and subjected the Cities to undue and unreasonable prejudice under section 392.200, RSMo Supp. 2012. The trial court further found CenturyLink's "unlawful actions" were willful under section 392.350 and ordered CenturyLink to pay attorney fees pursuant to sections 392.350, 488.472, and 527.100.

In 2015, the Cities filed their second motion for partial summary judgment in which they alleged their respective ordinances required CenturyLink to pay license taxes on all gross receipts. The Cities further alleged they were entitled to back taxes, interest, and penalties from CenturyLink for delinquent or underpaid taxes. In response, CenturyLink asserted the Cities' interpretation of their ordinances was unconstitutional because the Cities could not recover taxes for services furnished beyond their municipal boundaries. CenturyLink also contended the Cities failed to establish, as a matter of law, that their ordinances applied to the disputed types of revenue in the Cities.

On April 6, 2016, the trial court entered an order granting partial summary judgment in the Cities' favor. It found CenturyLink was liable for license taxes to each city for all revenue it received "in that City." It further concluded CenturyLink was in the business of

furnishing exchange telephone service in Aurora and Cameron and supplying telephone service in Oak Grove and Wentzville. The order stated CenturyLink "must pay license taxes in each City on all revenues in such City specified in the Court's Order June 2, 2014 and all other revenue in such City."

The June 2, 2014 order was entered after the Cities filed a motion to compel CenturyLink to disclose documentation pertaining to revenues received by CenturyLink from business or operations in each city. The trial court ordered CenturyLink to disclose all attributable revenue relating to each city and listed 29 different categories of revenue, including carrier access and interstate services.

In 2016, the case proceeded to trial on the limited issue of damages. The Cities called their expert witness to testify about his damages calculations, which included all types of the disputed forms of revenue. CenturyLink called several witnesses to testify about which revenue sources were derived from services furnished in the Cities. CenturyLink also introduced exhibit U2, which summarized the various revenue streams but excluded carrier access revenues from all the Cities and interstate service revenue from Wentzville. Exhibit U2 also credited CenturyLink for payments it had made under protest pursuant to section 139.031, RSMo Supp. 2012. CenturyLink began paying the Cities their license taxes under protest after the Cities filed suit. Those protest actions remained pending at the time of trial.

The Cities objected to testimony from CenturyLink's witnesses regarding which revenue streams were derived from services in the Cities on grounds that the April 6, 2016 partial grant of summary judgment had already determined that all revenue sources were

6

taxable under the Cities' respective ordinances. The Cities further objected to exhibit U2 on the ground CenturyLink had failed to provide them with the underlying documentation allegedly summarized in the exhibit. The trial court overruled the Cities' objections.

On February 23, 2017, the trial court entered its final judgment in which it found a five-year statute of limitations applied to the Cities' claims and declared the tax base under Aurora's, Cameron's, and Oak Grove's respective license tax ordinances was all revenue, other than carrier access revenue, received in each city. It also declared the tax base under Wentzville's license tax ordinance was all revenue, other than carrier access revenue and revenue derived from interstate telephone calls, received in Wentzville. The trial court then awarded the Cities damages using the amounts in exhibit U2 as the basis for its damages calculations. The trial court also credited CenturyLink for payments made under protest pursuant to section 139.031, RSMo Supp. 2012, and ordered CenturyLink to dismiss the protest actions currently pending with prejudice within 10 days of the judgment becoming final. The trial court further awarded Aurora, Cameron, and Oak Grove prejudgment interest at a rate of nine percent per annum under section 408.020 and awarded Wentzville prejudgment interest at a rate of two percent per month, not to exceed 18 percent per annum, pursuant to Wentzville's municipal code. Likewise, the trial court awarded Aurora, Cameron, and Oak Grove post-judgment interest at a rate of nine percent per annum pursuant to section 408.040 and awarded Wentzville post-judgment interest at a rate of two percent per month, not to exceed 18 percent per annum.

The trial court also found the Cities were not entitled to any penalties under their respective ordinances but awarded the Cities attorney fees pursuant to sections 392.350, 488.472, and 527.100, as well as Wentzville's municipal code.

The parties cross-appealed. Because CenturyLink challenged the constitutional validity of section 67.1846, this Court has exclusive jurisdiction over the appeal. Mo. Const. art. V, sec. 3.

## II. CenturyLink's Appeal

### A. Facially Special Law

In its first point, CenturyLink asserts the trial court erred by awarding Cameron damages for unpaid linear foot fees under the city's right-of-way ordinance because such fees are prohibited by statute and the grandfathered political subdivision exemption under section 67.1846.1 is a constitutionally invalid special law.[5] This Court reviews challenges

---

[5] The Cities contend CenturyLink waived this claim of error by failing to raise this constitutional issue at the earliest opportunity because, when a party files a pre-answer motion to dismiss, that motion is the earliest possible moment to raise a constitutional claim to avoid waiver. In support of their assertion, the Cities rely on *State v. Flynn*, 519 S.W.2d 10 (Mo. 1975). *Flynn*, however, was a criminal case and held: "The earliest possible moment consistent with good pleading and orderly procedure in which a party may raise a constitutional issue *pertaining to the information or indictment* is in a motion to dismiss." *Id.* at 12 (emphasis added). *Flynn*, therefore, does not pertain to the present action. Rather, "to preserve constitutional questions for review on appeal, the constitutional issue must be raised in the trial court at the earliest opportunity, consistent with good pleading and orderly procedure." *Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 701 (Mo. banc 2008). CenturyLink asserted the constitutional invalidity of section 67.1846.1 in response to the Cities' motion for partial summary judgment and again as an affirmative defense in its answer. Accordingly, CenturyLink raised the constitutional challenge at the earliest opportunity consistent with orderly procedure. *See Sharp v. Curators of Univ. of Mo.*, 138 S.W.3d 735, 738 (Mo. App. 2003) (explaining a challenge to the constitutional validity of a statute by a defendant is timely raised in an answer to the plaintiff's petition).

to the constitutional validity of a statute *de novo*. *Earth Island Inst. v. Union Elec. Co.*, 456 S.W.3d 27, 32 (Mo. banc 2015).

CenturyLink asserts section 67.1846.1 created a closed-ended class based on an immutable, historical fact and, thereby is, an unconstitutional special law. *See City of St. Louis v. State*, 382 S.W.3d 905, 914 (Mo. banc 2012). The Cities argue section 67.1846.1 is not a special law and, even if it is, the grandfathered political subdivision provision is substantially justified.

Because recent cases have generated complex and confusing criteria for application of the provisions in article III, section 40 of the Missouri Constitution, this Court must revisit its analysis of local or special law challenges under article III, section 40. Sections 40 through 42 provide:

Section 40. *The general assembly shall not pass any local or special law*:
(1) authorizing the creation, extension or impairment of liens;
(2) granting divorces;
(3) changing the venue in civil or criminal cases;
(4) regulating the practice or jurisdiction of, or changing the rules of evidence in any judicial proceeding or inquiry before courts, sheriffs, commissioners, arbitrators or other tribunals, or providing or changing methods for the collection of debts, or the enforcing of judgments, or prescribing the effect of judicial sales of real estate;
(5) summoning or empaneling grand or petit juries;
(6) for limitation of civil actions;
(7) remitting fines, penalties and forfeitures or refunding money legally paid into the treasury;
(8) extending the time for the assessment or collection of taxes, or otherwise relieving any assessor or collector of taxes from the due performance of their duties, or their securities from liability;

9

(9) changing the law of descent or succession;

(10) giving effect to informal or invalid wills or deeds;

(11) affecting the estates of minors or persons under disability;

(12) authorizing the adoption or legitimation of children;

(13) declaring any named person of age;

(14) changing the names of persons or places;

(15) vacating town plats, roads, streets or alleys;

(16) relating to cemeteries, graveyards or public grounds not of the state;

(17) authorizing the laying out, opening, altering or maintaining roads, highways, streets or alleys;

(18) for opening and conducting elections, or fixing or changing the place of voting;

(19) locating or changing county seats;

(20) creating new townships or changing the boundaries of townships or school districts;

(21) creating offices, prescribing the powers and duties of officers in, or regulating the affairs of counties, cities, townships, election or school districts;

(22) incorporating cities, towns, or villages or changing their charters;

(23) regulating the fees or extending the powers of aldermen, magistrates or constables;

(24) regulating the management of public schools, the building or repairing of schoolhouses, and the raising of money for such purposes;

(25) legalizing the unauthorized or invalid acts of any officer or agent of the state or of any county or municipality;

(26) fixing the rate of interest;

(27) regulating labor, trade, mining or manufacturing;

(28) granting to any corporation, association or individual any special or exclusive right, privilege or immunity, or to any corporation, association or individual the right to lay down a railroad track;

(29) relating to ferries or bridges, except for the erection of bridges crossing streams which form the boundary between this and any other state;

(30) *where a general law can be made applicable*, and whether a general law could have been made applicable is a judicial question to be judicially determined without regard to any legislative assertion on that subject.

Section 41. The general assembly shall not indirectly enact a special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

Section 42. No local or special law shall be passed unless a notice, setting forth the intention to apply therefor and the substance of the contemplated law, shall have been published in the locality where the matter or thing to be affected is situated at least thirty days prior to the introduction of the bill into the general assembly and in the manner provided by law. Proof of publication shall be filed with the general assembly before the act shall be passed and the notice shall be recited in the act.

Mo. Const. art. III, sec. 40-42 (emphasis added).[6]

Under these provisions, the legislature may enact local or special laws if it complies with the notice and publication requirements in section 42. Section 40, however, prohibits 30 types of local or special laws in all circumstances. Exceptions (1) through (29) are identified by the subject matter or effect of the law in question. Exception (30) forbids any local or special law "where a general law can be made applicable[.]" As a result, a plain reading of the constitutional language at issue shows that any party seeking to challenge the constitutional validity of a statute under article III, section 40(30), must demonstrate: (a) the statute is a local or special law and (b) a general law can be made applicable.

---

[6] "Since 1865, . . . the Missouri Constitution has prohibited special laws. *See* Mo. Const. of 1865, art. IV, sec. 27; Mo. Const. of 1875, art. IV, sec. 53; Mo. Const. of 1945, art. III, sec. 40(30)." *City of Normandy v. Greitens*, 518 S.W.3d 183, 191 (Mo. banc 2017).

11

The first element, that the statute is a local or special law, is a threshold requirement common to article III, sections 40 through 42. If a statute is not a local or special law, neither the notice and publication requirements in section 42 nor the specific prohibitions in subdivisions (1) through (30) of section 40 apply. The test for identifying local or special laws has received significant attention in this Court since these provisions were first added to the Missouri Constitution in 1865. In one of the earliest cases, this Court noted "a statute which relates to persons or things *as a class* is a general law, while a statute which relates to *particular persons or things of a class* is special, and that classification does not depend upon numbers." *State ex rel. Lionberger v. Tolle*, 71 Mo. 645, 650 (1880) (emphasis added) (internal quotations omitted). A few years later, this Court noted, "Class legislation is not necessarily obnoxious to the constitution. It is a settled construction of similar constitutional provisions that a legislative act which applies to and embraces all persons who are or who may come into like situations and circumstances is not partial." *Humes v. Mo. Pac. Ry. Co.*, 82 Mo. 221, 231 (1884) (internal quotations omitted).

Parties attacking a statute as a constitutionally invalid local or special law "inevitably . . . argu[e] that the statute treats some members of the class differently than others." *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 831 (Mo. banc 1991). Historically, this Court has held, however, if the criteria for a class in a statute is supported by a reasonable basis, then the statute is not a local or special law and the analysis should stop there. *See Ross v. Kan. City Gen. Hosp. & Med. Ctr.*, 608 S.W.2d 397, 400 (Mo. banc 1980) ("A law which includes less than all who are similarly situated is special, but a law is not special if it applies to all of a given class alike and the classification is made on a

12

reasonable basis."). This Court adopted the reasonable basis test in *Miners' Bank v. Clark,* 158 S.W. 597, 599 (Mo. 1913), holding "[a] statute is not special or class legislation if it appl[ies] to all alike of a given class, provided the classification thus made is not arbitrary or without a reasonable basis."

Later, this Court explicitly analogized the special law test to the rational basis test contained in equal protection jurisprudence,[7] concluding "the test for 'special legislation' . . . involves the same principles and considerations that are involved in determining whether the statute violates equal protection in a situation where neither a fundamental right nor a suspect class is involved, *i.e.*, where *a rational basis test applies.*" *Blaske,* 821 S.W.2d at 832 (emphasis added).[8]

---

[7] The analogy to equal protection, however, should not be interpreted to eliminate the need for special law provisions. Indeed, cities and counties do not have standing to sue under the Missouri Constitution's equal protection doctrine. *See City of Chesterfield v. Dir. of Revenue,* 811 S.W.2d 375, 377 (Mo. banc 1991).

[8] At least 47 other states apply a version of the reasonable or rational basis test to interpret special laws provisions. *See, e.g.*, *Dearborn v. Johnson*, 173 So. 864, 866-67 (Ala. 1937); *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1079 (Alaska 2009); *Valley Nat'l Bank of Phoenix v. Glover*, 159 P.2d 292, 299 (Ariz. 1945); *Knoop v. City of Little Rock*, 638 S.W.2d 670, 672 (Ark. 1982); *Hollman v. Warren*, 196 P.2d 562, 566-68 (Cal. 1948); *People v. Canister*, 110 P.3d 380, 383 (Colo. 2005); *Moran v. Bens*, 127 A.2d 42, 44 (Conn. 1956); *Clendaniel v. Conrad*, 26 Del. 549, 579 (1912); *State ex rel. Levine v. Bailey*, 168 So. 12, 12 (Fla. 1936); *Lasseter v. Ga. Pub. Serv. Comm'n*, 319 S.E.2d 824, 827 (Ga. 1984); *Arel v. T & L Enters.*, 189 P.3d 1149, 1155-56 (Idaho 2008); *Gen. Motors Corp. v. Ill. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 229 (Ill. 2007); *Caesar v. De Vault*, 141 N.E.2d 338, 341-43 (Ind. 1957); *City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 530-31 (Iowa 2008); *Associated Ry. Equip. Owners v. Wilson*, 208 P.2d 604, 612 (Kan. 1949); *Johnson v. Gans Furniture Indus.*, 114 S.W.3d 850, 856-57 (Ky. 2003); *Arshad v. City of Kenner*, 95 So.3d 477, 482 (La. 2012); *State v. Mayo*, 75 A. 295, 297-98 (Me. 1909); *Green v. N.B.S., Inc.*, 976 A.2d 279, 288-89 (Md. 2009*); Route One Liquors, Inc. v. Sec'y of Admin. & Fin.*, 785 N.E.2d 1222, 1231-32 (Mass. 2003); *Chamski v. Cowan*, 284 N.W. 711, 716 (Mich. 1939); *State v. Forge*, 262 N.W.2d 341, 347

The rational basis analysis served the Court and the language of the constitution well for more than a century. *See, e.g., State v. Gilley*, 785 S.W.2d 538, 540-41 (Mo. banc 1990) ("The state concludes that these substantial burdens on the state serve as a rational basis for the legislative enactment of § 508.355. The Court agrees. Section 508.355 is, therefore, neither a local nor special law."); *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73, 81 (Mo. banc 1979) ("[A prior case] illustrates the criteria by which it is determined whether a law is local or special. The classification must be reasonable, not arbitrary, and the privilege created by the law must be available to all entities within the classification."); *Marshall v. Kan. City*, 355 S.W.2d 877, 884 (Mo. banc 1962) ("[A] law is not special in the constitutional sense if it applies alike to all of a given

---

n.23 (Minn. 1977); *Culley v. Pearl River Indus. Comm'n*, 108 So.2d 390, 397-98 (Miss. 1959); *Rohlfs v. Klemenhagen, LLC*, 227 P.3d 42, 45-47 (Mont. 2009); *Yant v. City of Grand Island*, 784 N.W.2d 101, 106 (Neb. 2010); *Ex parte Pittman*, 99 P. 700, 703 (Nev. 1909); *Opinion of the Justices*, 254 A.2d 273, 276-77 (N.H. 1969); *Garcia ex rel. Garcia v. La Farge*, 893 P.2d 428, 434-35 (N.M. 1995), *overruled on other grounds by Cahn v. Berryman*, 408 P.3d 1012, 1014 (N.M. 2017); *Jordan v. Horsmen's Benevolent & Protective Ass'n*, 448 A.2d 462, 467-69 (N.J. 1982); *Hotel Dorset Co. v. Trust for Cultural Res. of N.Y.C.*, 385 N.E.2d 1284, 1288-94 (N.Y. 1978); *Williams v. Blue Cross Blue Shield of N.C.*, 581 S.E.2d 415, 425-29 (N.C. 2003); *Teigen v. State*, 749 N.W.2d 505, 509-14 (N.D. 2008); *State ex rel. McNamera v. Brown*, 132 N.E.2d 208, 210 (Ohio 1956); *Grant v. Goodyear Tire & Rubber Co.*, 5 P.3d 594, 598 (Okla. 2000); *City of Portland v. Welch*, 59 P.2d 228, 300 (Or. 1936); *Pa. Tpk. Comm'n v. Commonwealth*, 899 A.2d 1085, 1094-97 (Pa. 2006); *Carroll v. Town of York*, 95 S.E. 121, 123 (S.C. 1918); *Associated Gen. Contractors v. Schreiner*, 492 N.W.2d 916, 924-25 (S.D. 1992); *McCarver v. Ins. Co. of Pa.*, 208 S.W.3d 380, 384-85 (Tenn. 2006); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945-47 (Tex. 1996); *Colman v. Utah State Land Bd.*, 795 P.2d 622, 636 (Utah 1990); *City of Montpelier v. Gates*, 170 A. 473, 476 (Vt. 1934); *Jefferson Green Unit Owners Ass'n v. Gwinn*, 551 S.E.2d 339, 344-46 (Va. 2001); *Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 689-90 (Wash. 2004); *Gallant v. Cnty. Comm'n of Jefferson Cty.*, 575 S.E.2d 222, 230-31 (W. Va. 2002); *Libertarian Party of Wisc. v. State*, 546 N.W.2d 424, 431-33 (Wis. 1996); *Mountain Fuel Supply Co. v. Emerson*, 578 P.2d 1351, 1356 (Wyo. 1978).

14

class provided the classification thus made is not arbitrary or without a reasonable basis.”);

*ABC Liquidators, Inc. v. Kan. City*, 322 S.W.2d 876, 885 (Mo. 1959) (“It is well established in this state that a law is not a special law if it appl[ies] to all alike of a given class, provided the classification thus made is not arbitrary or without reasonable basis.” (internal quotations omitted)); *McKaig v. Kan. City*, 256 S.W.2d 815, 818 (Mo. banc 1953) (“A law may not include less than all who are similarly situated. If it does, it is special, and therefore invalid, because it omits a part of those which in the nature of things the reason of the law includes.”); *City of Springfield v. Stevens*, 216 S.W.2d 450, 455 (Mo. banc 1949) (“If the ordinance includes all who are similarly situated and there is a reasonable basis for the classification, the ordinance is not a special law that violates the constitutional provision relied upon.”); *Thompson v. St. Louis-S.F. Ry. Co.*, 69 S.W.2d 936, 943 (Mo. 1933) (“A statute is not special or class legislation if it appl[ies] to all alike of a given class, provided the classification thus made is not arbitrary or without a reasonable basis.”).

The rational basis analysis, however, has been diminished in recent years. This Court incorrectly has distinquished between classifications drawn using open-ended criteria (sometimes, but not always,[9] the population of the affected and excluded areas) and classifications drawn using closed-ended or immutable criteria (for example, geography, actions taken prior to the statute's passage, or simply the names of affected and excluded persons or places). *See, e.g., City of Normandy*, 518 S.W.3d at 191 (“The test employed

---

[9] *See Jefferson Cty. Fire Protection Dists. Ass'n v. Blunt*, 205 S.W.3d 866, 870 (Mo. banc 2006) (announcing a new, prospective, three-part test so courts “can determine whether a population classification will maintain its presumption of constitutionality”).

15

to determine if a statute is a special law is whether the statute's applicability is based on open-ended or closed-ended characteristics."); *City of DeSoto v. Nixon*, 476 S.W.3d 282, 287 (Mo. banc 2016) ("The most often applied test for determining whether a law qualifies as a special law is whether the law is based on open-ended or closed-ended characteristics."). Additionally, this Court recently held that if a law's application is based on closed-ended criteria, it is "facially" a local or special law and is presumptively constitutionally invalid, *see City of Normandy*, 518 S.W.3d at 191, unless the party defending the constitutionality of the statute shows a "substantial justification" for the legislature's decision to use a local or special law. *See, e.g.*, *City of DeSoto*, 476 S.W.3d at 287 ("If a law is facially special, the party defending the facially special law must demonstrate a substantial justification for the failure to adopt a general law instead."); *Treadway v. State*, 988 S.W.2d 508, 511 (Mo. banc 1999) ("Unconstitutionality of a special law is presumed and there must be 'substantial justification' for excluding other political subdivisions." (internal citations omitted)); *Harris v. Mo. Gaming Comm'n,* 869 S.W.2d 58, 65 (Mo. banc 1994) ("The party defending the facially special statute must demonstrate a 'substantial justification' for the special treatment.").

The term "substantial justification" appears to have originated in a tax case more than 50 years ago. In *Airway Drive-In Theatre Co. v. City of St. Ann*, 354 S.W.2d 858, 859 (Mo. banc 1962), this Court analyzed an annual license tax of $1.50 per speaker for drive-in theaters, compared with a flat tax rate of $50 per year for indoor theaters. The Court reviewed the license tax in accordance with article X, section 3 of the Missouri Constitution, which provides taxes "shall be uniform upon the same class of subjects within

16

the territorial limits of the authority levying tax." *Id.* at 860. After finding the tax was imposed to raise revenue rather than to regulate, the Court held:

> [T]he ordinance imposing the tax is contrary to what we consider to be the correct and sound rule that "although a subclassification for license purposes may be *justified* on *substantial grounds*, the taxing power cannot unjustly discriminate, such as in the amount of the tax imposed, between the subdivisions so made." . . . This is but another way of saying that the resulting subclassification is arbitrary, unreasonable and without *substantial justification*.

*Id.* at 861 (emphasis added) (internal citation omitted).

Citing *Airway Drive-In Theatre*, the dissenting opinion in *Associated Industries of Missouri v. State Tax Commission of Missouri*, 722 S.W.2d 916, 925 (Mo. banc 1987) (Rendlen, J., dissenting), grafted the "substantial justification" language onto an equal protection and due process case, equating it with a "rational basis." Next, in *O'Reilly v. City of Hazelwood*, 850 S.W.2d 96, 99 (Mo. banc 1993), this Court adopted a new "substantial justification" test for special laws, holding: "Because the St. Louis County Boundary Commission Act is not open-ended, the respondents must do more: they must demonstrate a substantial justification to include other counties." *Id.* The final misdirection occurred in *City of Normandy*, when this Court placed the burden of presenting evidence of substantial justification on the party defending the statute. 518 S.W.3d at 196-97. The Court noted prior cases upheld special laws when the party defending them presented evidence of substantial justification for the special treatment. *Id.* at 196. It went on to say, "By presenting no evidence of substantial justification for the presumed special laws, the State failed to overcome the presumption of constitutional invalidity." *Id.* at 197.

17

The expansion of the analysis to encompass whether a statute's application is based on open-ended or closed-ended criteria and to require evidence of substantial justification does not comport with the plain language of article III, section 40. Particularly, article III, section 40 suggests neither that certain special laws are presumptively constitutionally invalid[10] nor that such a presumption may be overcome if the limitation of the law's application is supported by a "substantial justification." Rather, every law is entitled to a presumption of constitutional validity in this Court, and if the line drawn by the legislature is supported by a rational basis, the law is not local or special and the analysis ends. If the classification is not supported by a rational basis, the threshold requirement for a special law in section 40 is met and the party challenging the statute must then proceed to show the second element: either that the law offends one of the specific subject matter prohibitions in subdivisions (1) through (29) of section 40, or that the law is one "where a general law can be made applicable" under subdivision (30).[11] Of course, subdivision (30)

---

[10] The language in article III, section 40(30) provides no support for adopting a presumption of constitutional invalidity.

> When a special law is passed . . . the legislature necessarily determines, in the first instance, that a general law cannot be made to apply. But their determination is not final. There is, of course, a presumption that public officers have discharged their duties properly and every act of the legislature is presumed to be valid until there is a judicial determination to the contrary.

*Borden Co. v. Thomason*, 353 S.W.2d 735, 764 (Mo. banc 1962) (alterations in original); *see also Stevens*, 216 S.W.2d at 455 ("The presumption exists that the ordinance is constitutional, as against the contention that it is invalid as a special law where a general law could be made applicable.").

[11] It bears repeating that, if a law excludes one or more persons or places from its effect but the exclusion is supported by a rational basis, the law is not a local or special law and article

states that "whether a general law could have been made applicable is a judicial question to be judicially determined without regard to any legislative assertion on that subject." But this requirement does not change the fact the law will be presumed constitutional and the burden of showing both elements ordinarily resides with the party challenging a statute under article III, section 40. *See State ex rel. Bunker Res. Recycling & Reclamation, Inc. v. Mehan,* 782 S.W.2d 381, 385 (Mo. banc 1990) ("One who assails the classification must carry the burden of showing that it is essentially arbitrary and unreasonable.").

In shifting the burden of proof to the party defending the constitutional validity of the law to offer a "substantial justification,"[12] this Court has converted the burden of

---

III, section 40 does not apply. Said another way, a law for which there is a rational basis between those persons or places included and those excluded is a general law.

[12] Contrary to the conclusion in *City of Normandy*, 518 S.W.3d at 196, that *O'Reilly*, 850 S.W.2d at 99, first shifted the burden of proof, this burden-shifting seems to have originated in *State ex rel. Public Defender Commission v. County Court of Greene County*, 667 S.W.2d 409 (Mo. banc 1984). There, the Court reasoned that the ordinary presumption of constitutional validity when the attacker claims a law is an invalid local or special law "suggests the reason why it is inapposite to this case, as relator does not challenge a classification but rather challenges a specific exception from a classification." *Id.* at 413. The Court further wrote:

> The rationale for requiring such a *prima facie* showing disappears where the legislation describes an affected class by reference to a factor which bears a reasonable relation to the purpose of the enactment (in this case, population) but then excepts a specific member of that class. In this circumstance, the statute is special on its face and the law may presume its invalidity.

*Id.*

In *County Court of Greene County*, the Court concluded that:

> [I]nstead of inquiring whether relator met its burden in support of validity, it is proper to consider whether Greene County has offered any possible rationale whereby the Thirty-first Judicial Circuit may be distinguished from

persuasion that ordinarily applies to a party charged with showing a lack of rational basis in a constitutional context, into a mandatory requirement for the production of evidence necessary to defeat summary judgment. *See City of Normandy*, 518 S.W.3d at 197 ("By presenting no evidence of substantial justification for the presumed special laws, the State failed to overcome the presumption of constitutional invalidity."); *City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, 186 (Mo. banc 2006) ("The burden, therefore, shifts to . . . the party defending the statute[] to show that it is constitutional. To meet this standard, the mere existence of a rational or reasonable basis for the classification is insufficient."). This burden-shifting and the substantial justification test have no basis in article III, sections 40 through 42, and should no longer be followed.

It may be that, in the 15 decades since the prohibition against certain local or special laws first was added to the Missouri Constitution, this Court's analysis began to conflate the absence of a rational basis with the absence of a "substantial justification" for such a law. And it also may be that, at some point, this Court began to conflate the question of whether the local or special law at issue was one "where a general law could be made applicable" under section 40(30) with the question of whether that local or special law was substantially justified. The former error unnecessarily heightens the level of scrutiny

---

all other judicial circuits having a population of at least 75,000 with respect to the need for state-appointed public defenders.

*Id.* Still, this is far from the wholesale burden-shifting adopted recently in every case using closed-ended criteria. Even then, the Court did not impose on the statute's defender the strict evidentiary requirement imposed by this Court in recent times. It merely stated: "No such rationale [i.e., rational basis] appears in the record, either at trial or on appeal, nor does any palpably relevant distinction suggest itself to this Court." *Id.*

employed in the threshold determination whether a statute is a local or special law. The latter error unnecessarily blurs the line between this threshold element in section 40 and the second element – that one of the 30 specific prohibitions against such law has been violated. The resulting confusion from these errors diluted the constitutional language and generated complex and confusing criteria for analyses of whether a statute is a prohibited special law. Hereafter, this Court shall return to the rational basis test outlined above.

In the present case, sections 67.1830 to 67.1846 generally prohibit political subdivisions from recovering payments from public utility right-of-way users for the use or rent of public rights-of-way in excess of the political subdivision's management costs. But this prohibition does not apply to all political subdivisions. The "grandfather" provision, section 67.1846.1, excludes any political subdivision that enacted ordinances imposing linear foot fees on public right-of-way users prior to May 1, 2001.

As the movants for summary judgment, the Cities had the burden of proving they were entitled to judgment as a matter of law. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993). Additionally, "a claimant moving for summary judgment in the face of an affirmative defense must also establish the affirmative defense fails as a matter of law." *Id.* at 381 (citing Rule 74.04(c)). Therefore, although a party defending the constitutional validity of a statute under the rational basis test does not bear the burden of proof at trial, because the Cities moved for summary judgment in the face of an affirmative defense, they bore the burden of showing the grandfathered political subdivision provision was supported by a rational basis. "Under rational basis review, this Court will uphold a statute if it finds a reasonably conceivable

21

state of facts that provide a rational basis for the classifications." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 378 (Mo. banc 2012) (internal quotations and alterations omitted). Identifying a rational basis is an objective inquiry that does not require unearthing the legislature's subjective intent in making the classification. *See id.*

Although whether the legislature used closed-ended or open-ended criteria to define classes is immaterial, the criteria used to exclude certain political subdivisions sheds light on whether there was a rational basis for the legislature's decision to exclude certain members. The Cities asserted:

> By enacting linear foot fees, cities likely had forbore pursuing revenue from other sources like taxes and other user fees. Because existing sources of revenue of cities would be lost without operation of the grandfathering provision, it is not irrational to preserve existing revenue sources for local governments and simply prohibit new reliance on such linear foot fees in the future.

Protecting previously established revenue sources for political subdivisions that enacted ordinances charging linear foot fees prior to May 1, 2001, satisfies the rational basis test. The provision balances the reasonable reliance of those political subdivisions that chose this method of raising revenue when doing so was perfectly lawful with the legislature's desire to implement a policy against imposing such fees as a revenue generating device for political subdivisions. This provision was a rational effort by the legislature to impose a new policy without disrupting the reasonable reliance of those that acted lawfully before the change in policy. Therefore, section 67.1846.1 is not a special law.

**B. Cameron's Linear Foot Fees**

In its second point, CenturyLink also contends Cameron failed to present any evidence that its linear foot fees are based on the "actual, substantiated costs reasonably incurred" in managing its rights-of-way. To support its claim that Cameron bore a burden of establishing its right-of-way fees were based on "actual, substantiated costs reasonably incurred by the political subdivision," CenturyLink cited section 67.1840.2(1). This section fails to support CenturyLink's claim. Rather, section 67.1840.2(1) requires that "[r]ight-of-way *permit* fees imposed by a political subdivision on public utility right-of-way users" be "[b]ased on the actual, substantiated costs reasonably incurred." (Emphasis added). Section 67.1830(11) defines a "[r]ight-of-way permit" as "a permit issued by a political subdivision authorizing the performance of excavation work in a public right-of-way." Cameron did not seek, and CenturyLink is not challenging, an award for fees associated with Cameron's right-of-way permits under section 67.1840.2(1). Instead, Cameron sought monthly user fees, i.e., linear foot fees, as authorized by section 67.1846.[13]

---

[13] Section 67.1846.1 states:

> Nothing in sections 67.1830 to 67.1846 shall prevent a grandfathered political subdivision from enacting new ordinances, including amendments of existing ordinances, charging a public utility right-of-way user a fair and reasonable linear foot fee or antenna fee or from enforcing or renewing existing linear foot ordinances for use of the right-of-way, provided that the public utility right-of-way user either: (1) Is entitled under the ordinance to a credit for any amounts paid as business license taxes or gross receipts taxes; or (2) Is not required by the political subdivision to pay the linear foot fee or antenna fee if the public utility right-of-way user is paying gross receipts

Accordingly, reliance on section 67.1840.2(1) is unavailing, and CenturyLink has not demonstrated that Cameron failed to submit necessary evidence of its linear foot fee costs. The trial court did not err in entering summary judgment on Cameron's claim for linear foot fees. The provision in the trial court's grant of summary judgment awarding Cameron linear foot fees is affirmed.

### C. Mandatory Franchises

Also in its second point, CenturyLink asserts the trial court erred in requiring it to enter into right-of-way permits or user agreements with Cameron and Wentzville because their right-of-way permits and agreements are illegal and void in that they constitute mandatory "franchises" prohibited by section 67.1842.1(4). Section 67.1842.1(4) provides, in pertinent part: "In managing the public right-of-way and in imposing fees pursuant to sections 67.1830 to 67.1846, no political subdivision shall . . . [r]equire a telecommunications company to obtain a franchise."

The statute does not define the term "franchise." Nevertheless, CenturyLink asserts Missouri courts have defined "franchise" to encompass all transactions in which the government grants a privilege or authorization to an individual entity that is not common to the citizens generally. In support of its assertion, CenturyLink relies on *State ex Inf. McKittrick v. Murphy*, 148 S.W.2d 527 (Mo. banc 1941). But *McKittrick* discusses the meaning of "franchise" in the context of a *quo warranto* action. *Id.* at 530.

----

taxes, business license fees, or business license taxes that are not nominal and that are imposed specifically on communications-related revenue, services, or equipment.

Furthermore, CenturyLink's reliance on *McKittrick*'s definition of "franchise" is inconsistent with reading section 67.1842 as a whole. In determining legislative intent, the statute is read as a whole and *in pari materia* with related sections. *Lane v. Lensmeyer*, 158 S.W.3d 218, 226 (Mo. banc 2005). This Court presumes "each word, clause, sentence, and section of a statute will be given meaning and that the legislature did not insert superfluous language." *Macon Cnty. Emergency Servs. Bd. v. Macon Cnty. Comm'n*, 485 S.W.3d 353, 355 (Mo. banc 2016).

CenturyLink's interpretation of the term "franchise" would encompass seemingly all contracts and agreements between municipalities and public utilities. But other portions of section 67.1842 speak in terms of "contracts" and "agreements" between utilities and political subdivisions. *See* section 67.1842.1(5)-(6). Were "franchise" to mean all transactions in which the government grants a privilege or authorization to an individual entity that is not common to the citizens, sections 67.1842(5) and 67.1842(6) would also speak in terms of franchises.

Additionally, while CenturyLink avers Cameron's and Wentzville's right-of-way user agreements are improper, mandatory franchises, CenturyLink fails to provide this Court with any further explanation as to why such agreements are franchises other than that they are required under the Cities' respective ordinances. In fact, CenturyLink does not provide this Court with an example of such agreements or cite to any language or provisions used in the Cities' right-of-way user agreements. Without knowing what is required under Cameron's and Wentzville's respective right-of-way agreements, this Court cannot conclusively find such agreements violate section 67.1842(4)'s ban on mandatory

25

franchises. Accordingly, CenturyLink has failed to establish the trial court erred by requiring CenturyLink to enter into right-of-way user agreements with Cameron and Wentzville.

## D. License Taxes on Gross Receipts

In its third point, CenturyLink asserts the trial court erred in entering partial summary judgment on liability with respect to the Cities' license tax ordinances. CenturyLink contends "numerous categories" of its revenue are not derived from "exchange telephone service" or "telephone service" and, therefore, are not subject to taxation under the Cities' ordinances. The trial court concluded the terms of the Cities' ordinances were unambiguous, and it gave effect to the language of the ordinances without regard to extrinsic evidence. The trial court further found CenturyLink was "liable for license taxes to each City for all revenue [it] receive[s] in that respective City."

Section 615.010 of Aurora's license tax ordinance provides:

Every person, firm, company or corporation now or hereafter engaged in the business of furnishing exchange telephone service in the City of Aurora, Missouri, shall pay the said City as an annual license tax, six percent (6%) of the gross receipts derived from the furnishing of such service within said City, as hereinafter set forth.

Cameron's license tax ordinance contains identical language, except it provides for an annual license tax of five percent of the gross receipts.

Oak Grove's license tax ordinance provides:

Every person now or hereafter engaged in the business of supplying gas, telephone service or water for compensation for any purpose in the City of Oak Grove . . . shall pay to the City of Oak Grove as a license tax a sum equal to five percent (5%) of the gross receipts from such business.

Wentzville's license tax ordinance similarly provides for a five-percent tax on the gross receipts from individuals engaged in the business of supplying "telephone service . . . in the City."

The interpretation of a municipal ordinance is a matter of law that is reviewed *de novo*. *City of St. Peters v. Roeder*, 466 S.W.3d 538, 543 (Mo. banc 2015). This Court employs the rules governing statutory interpretation when interpreting an ordinance. *Tupper v. City of St. Louis*, 468 S.W.3d 360, 371 (Mo. banc 2015). Absent a definition provided in the ordinance, this "Court will ascertain and give effect to the intent of the enacting legislative body as reflected in the plain and ordinary meaning of the ordinance's language." *Id.* (internal quotation omitted).

CenturyLink acknowledges the Cities' ordinances do not provide definitions for the terms "exchange telephone service" or "telephone service." Nevertheless, it asserts such terms have technical meanings in the telecommunications industry that must control when interpreting the ordinances. Missouri courts have held "words and phrases having a technical meaning are to be considered as having been used in a statute or ordinance in their technical sense, unless it appears that they were intended to be used otherwise." *City of St. Louis v. Triangle Fuel Co.*, 193 S.W.2d 914, 915 (Mo. App. 1946); *see also Clarkson v. Hatton*, 44 S.W. 761, 762 (Mo. 1898). Courts may ascertain the meaning of technical words and phrases "by referring to persons who have knowledge on the subject or by consulting books of reference containing information thereon." *Rose v. Franklin Life Ins. Co.*, 132 S.W. 613, 615 (Mo. App. 1910).

27

In support of its assertion that "exchange telephone service" or "telephone service" are technical terms, CenturyLink relies on several affidavits and case law from other jurisdictions. While one of the affidavits purports to provide a definition of "exchange telephone service," the affidavit focuses on what services are not "exchange telephone service" according to the affiant. Therefore, the affidavit does not provide an industry definition for "exchange telephone service." Similarly, the two other affidavits on which CenturyLink relies do not establish a technical, industry meaning for the term "exchange telephone service." Instead, those affidavits draw distinctions between local telephone exchanges and interexchange telephone services. None of the Cities' ordinances speak in terms of "local telephone exchanges" or "interexchange telephone services." Rather, the ordinances tax "exchange telephone service" and "telephone service." Accordingly, the affidavits relied on by CenturyLink fail to establish "exchange telephone service" or "telephone service" have technical meanings or are terms of art in the telecommunications industry.

Additionally, CenturyLink relies on *GTE Sprint Communications Corp. v. Department of Treasury*, 445 N.W.2d 476, 478-79 (Mich. Ct. App. 1989), and *North Carolina Utilities Commission v. F.C.C.*, 552 F.2d 1036, 1045 (4th Cir. 1977). These cases, however, rely on the definition of "telephone exchange service" provided in the federal Communications Act of 1934. *See* 47 U.S.C. § 153. There is no indication this federal, statutory definition controlled in the Cities' adoption of their respective gross license tax ordinances. CenturyLink, therefore, has failed to establish the trial court erred

28

in interpreting the Cites' license tax ordinances with respect to the terms "exchange telephone service" or "telephone service."

### E.  Services "in" or "within" the Cities

In its fourth point, CenturyLink contends the trial court erred in awarding more than $1.5 million in actual damages for unpaid license taxes because the Cities failed to carry their burden of proof in that they did not establish the disputed services were derived from the furnishing of services within the Cities.  CenturyLink asserts it provided uncontroverted testimony from its witnesses and experts that the disputed revenue sources did not occur within the Cities and that the only testimony provided by the Cities was from their expert, an accountant, who had no knowledge of which revenue sources were derived from the Cities.

But the Cities introduced exhibits detailing the revenue numbers earned in each city as produced by CenturyLink.  The Cities' expert testified the records showed revenues earned in the Cities because every record identified a city or was categorized by a city.  Their expert further testified he took the information from such records and summarized the data by city and month.  Accordingly, the Cities introduced evidence of revenue earned in each city.

CenturyLink attempted to discredit the Cities' expert and exhibits as to damages by relying on its witnesses' testimony as to which services did not generate revenue "in" a city.  But the trier of fact "is free to believe any, all, or none of a witness's testimony." *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo. banc 2010), and CenturyLink's witnesses were cross-examined extensively about whether the disputed revenues were derived from

29

the furnishing of services in the Cities. The Cities, therefore, did not fail to meet their burden of establishing which revenues were derived from the Cities.

CenturyLink further asserts the circuit court's order fails to acknowledge the constitutional limitations on the Cities' tax collection powers. CenturyLink contends it is unconstitutional, under the United States and the Missouri constitutions, to tax all services without regard to whether those services reach beyond the Cities' municipal boundaries. Generally, "a municipal corporation's powers cease at its municipal boundaries, and cannot, without a plain delegation of the necessary power from a proper authority, be exercised outside its geographical limits." *City of St. Louis v. Lee*, 132 S.W.2d 1055, 1057 (Mo. App. 1939).

In making such assertions, CenturyLink fails to identify which services were taxed beyond the municipal boundaries. CenturyLink provides no citation to the transcript or record establishing the Cities exercised their taxing authority beyond their borders. Instead, CenturyLink makes a general accusation that the trial court overlooked such constitutional limitations when it found CenturyLink was required to pay taxes on all revenue sources besides carrier access revenue.

The party challenging the constitutional validity of an ordinance bears the burden of establishing the municipality exceeded its constitutional authority. *Coop. Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 578 (Mo. banc 2017). This Court presumes municipal ordinances are "valid and lawful." *Id.* CenturyLink's broad, unsupported assertions are insufficient to overcome such presumption.

30

## F. Controlling Oak Grove Ordinance

In its fifth point, CenturyLink contends the trial court erred in refusing to set aside the partial summary judgments as to liability with respect to Oak Grove because a 1996 ordinance memorializing a franchise agreement[14] between Oak Grove and CenturyLink is the controlling ordinance, not Oak Grove's general utility ordinance. The trial court concluded the 1996 ordinance did not control because there was no evidence in the record CenturyLink ever filed an acceptance of the 1996 ordinance with the city clerk. The trial court noted that the 1996 ordinance expressly provided CenturyLink "shall file its acceptance of this ordinance with the Clerk of the City" and that CenturyLink's "failure to comply with the terms and conditions of this ordinance shall work a forfeiture of this franchise."

CenturyLink asserts the undisputed record shows the 1996 ordinance was signed, executed, and accepted. In doing so, CenturyLink relies on affidavits from former employees stating the common practice was to sign franchise agreements and return them

---

[14] The 1996 franchise agreement provided:

> In consideration for the rights and privileges herein granted, [CenturyLink] shall pay the City quarterly, in arrears, five percent of the local service revenues to the City. . . . This payment shall be lieu [sic] of any general or special license tax, occupation tax, or any other such tax for the period covered during the term of this ordinance. For purposes of this ordinance "local service revenues" shall include all revenues received by [CenturyLink] for the provision of basic local exchange telecommunications service, including those services which expand the basic local calling scope of the customer or subscriber, but shall not include charges for special services, long distance calls, access charges, or services not considered basic local exchange telecommunications service.

to the cities as quickly as possible. The affidavits, however, were limited to common practices and did not state that CenturyLink filed the Oak Grove franchise agreement with the city. In contrast, the affidavit from the Oak Grove's city clerk stated there is no acceptance of the 1996 ordinance on file and, had one been filed, it would be in the city's records. Accordingly, CenturyLink failed to establish the trial court erred in overruling the motion to set aside the partial summary judgments entered in favor of Oak Grove.

## G. Statute of Limitations

In its sixth point, CenturyLink asserts the circuit court erred in applying a five-year statute of limitations because section 71.625, RSMo Supp. 2012, requires application of the three-year statute of limitations set forth in section 144.220.3. The Cities contend the trial court correctly applied the five-year statute of limitations in section 516.120.[15]

---

[15] Section 516.120 provides:

> Within five years:
> (1) All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110, and except upon judgments or decrees of a court of record, and except where a different time is herein limited;
> (2) An action upon a liability created by a statute other than a penalty or forfeiture;
> (3) An action for trespass on real estate;
> (4) An action for taking, detaining or injuring any goods or chattels, including actions for the recovery of specific personal property, or for any other injury to the person or rights of another, not arising on contract and not herein otherwise enumerated;
> (5) An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.

Missouri courts have applied section 516.120 to municipal tax actions. *See City of Columbia ex rel. Exch. Nat'l Bank v. Johnson Inv. & Rental Co.*, 462 S.W.2d 133, 136

Section 71.625.2, RSMo Supp. 2012, provides: "The limitation for bringing suit for the collection of the delinquent tax and penalty shall be the same as that provided in sections 144.010 to 144.510." Section 144.220.3 states: "[E]very notice of additional amount proposed to be assessed under this chapter shall be mailed to the person within three years after the return was filed or required to be filed."

CenturyLink contends section 144.220.3 constitutes a three-year statute of limitation to commence an action. But this Court has rejected this interpretation of section 144.220 as a limitation on the commencement of an action. *See Excel Drug Co. v. Mo. Dep't of Revenue*, 609 S.W.2d 404, 410 (Mo. banc 1980). In *Excel*, this Court explained, "The making of an assessment does not constitute the commencement of an action." *Id.* The Court then stated the limitation period in section 144.220 pertained to "the Director's authority to make an additional assessment." *Id.* (interpreting section 144.220.2, RSMo 1978, which contained the same language at issue in section 144.220.3, RSMo 2000).

CenturyLink relies on *Shelter Mutual Insurance Co. v. Director of Revenue*, 107 S.W.3d 919, 923 (Mo. banc 2003), for the proposition that this Court has since referred to section 144.220.3 as a statute of limitations. When read in context, however, this Court speaks of section 144.220.3 as a statute of limitations for the director's filing of an assessment, not the commencement of an action. Accordingly, CenturyLink's reliance on section 144.220.3 is misplaced, and the trial court did not err in refusing to apply a three-year statute of limitations.

_____

(Mo. App. 1970); *State ex rel. Collector of Revenue of City of St. Louis v. Robertson*, 417 S.W.2d 699, 700 (Mo. App. 1967).

## H. Prejudgment Interest

In its seventh point, CenturyLink asserts the trial court erred in awarding prejudgment interest under the general prejudgment interest statute, section 408.020, instead of pursuant to sections 71.625.2, RSMo Supp. 2012, 144.170, and 32.065. Section 71.625.2, RSMo Supp. 2012, provides, in pertinent part: "Except as otherwise provided by law, the interest provisions of section 144.170 and penalty provisions of section 144.250 relating to delinquent sales taxes shall apply to delinquent taxes due as a result of the imposition of a license tax by any municipal corporation." Section 144.170 states, "All taxes not paid to the director of revenue . . . shall bear interest at the rate determined by section 32.065 from and after such [due] date until paid." Section 32.065.1, provides the director of revenue shall establish the annual interest rates, and the director does so in 12 C.S.R. 10-41.010(1). From August 28, 2012, to January 1, 2017, the rate of interest on unpaid taxes was three percent. On January 1, 2017, the rate increased to four percent. By contrast, section 408.020 provides for an interest rate of nine percent per annum.

CenturyLink is correct that section 408.020 is the general prejudgment interest statute and section 71.625.2, RSMo Supp.2012, is the more specific statute that governs interest on delinquent taxes due as a result of the imposition of a license tax by a municipal corporation. With no other considerations, a specific statute will control over a general statute. "[W]here one statute deals with the subject in general terms and the other deals in a specific way, to the extent they conflict, the specific statute prevails over the general statute." *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 668 (Mo. banc 2010). Here, the specific statute was not in effect during the entire period interest accrued prior to judgment,

and the rate of interest applicable under the specific statute changed after it became effective.

The Cities contend *Utilicorp United, Inc. v. Director of Revenue*, 785 S.W.2d 277 (Mo. banc 1990), prohibits application of section 71.625.2, RSMo Supp. 2012. In *Utilicorp,* a new statute allowed for the recovery of prejudgment interest in an action where it was not previously recoverable. *Id.* at 278. The case at hand is distinguishable in that section 71.625.2, RSMo Supp. 2012, does not provide the Cities with a right to recover interest they were not previously entitled to recover. Section 408.020 already provided that right. Section 71.625.2, RSMo Supp. 2012, merely alters the rate of interest. It does not create a right to recover interest for the first time. Accordingly, *Utilicorp* does not control as the Cities contend.

Rather, *Senn v. Commerce-Manchester Bank*, 603 S.W.2d 551, 553-54 (Mo. banc 1980), applies when the interest rate changes during the period interest accrues. It holds a statute imposing a different rate of interest may apply to judgments rendered before the date on which it became effective, but the new rate applies only prospectively, i.e., to interest accruing after the effective date.[16] *Id.* at 554. In *Senn*, section 408.040, RSMo 1978, the postjudgment interest statute, was amended to allow for a higher interest rate after a judgment had been rendered in the trial court. *Id.* at 553. The amended statute

---

[16] *Senn* addressed a change in the rate of postjudgment interest under section 408.040, RSMo 1978, but it is equally applicable to prejudgment interest under section 408.020 because the right to receive interest under either statute depends entirely on what the legislature chooses to prescribe. 603 S.W.2d at 554; *White v. St. Louis-S.F. Ry. Co.*, 602 S.W.2d 748, 756 (Mo. App. 1980).

applied to the judgment already rendered, but interest began to accrue at the higher rate from the effective date of the statute, not from the date judgment was entered. *Id.* at 554. Similarly, when section 408.020, RSMo 1978, was amended to increase the rate of prejudgment interest, the court of appeals applied the amended statute to claims already accrued but applied the amended rate only prospectively from the effective date of the amendment. *See Garrett v. Citizens Sav. Ass'n*, 636 S.W.2d 104, 112 (Mo. App. 1982); *Cotton v. 71 Highway Mini-Warehouse*, 614 S.W.2d 304, 308 (Mo. App. 1981).

In this case, prejudgment interest accrued at the rate of nine percent per annum under section 408.020 prior to August 28, 2012 (the effective date of section 71.625.2, RSMo Supp. 2012). On August 28, 2012, the rate of interest applicable by virtue of sections 71.625.2, RSMo Supp. 2012, 144.170, and 32.065 and 12 C.S.R. 10-41.010(1) was three percent. On January 1, 2017, that rate increased to four percent. Consequently, the trial court erred in failing to award the rate of prejudgment interest applicable under section 71.625.2, RSMo Supp. 2012, with respect to Aurora, Cameron, and Oak Grove from the date it became effective.

CenturyLink further contends the trial court erred in awarding prejudgment interest to Wentzville pursuant to its ordinance allowing for an interest rate of "2% per month, not to exceed 18% per annum." CenturyLink asserts the ordinance is void because it provides for a rate of interest higher than the rate established in section 71.625.2, RSMo Supp. 2012. *See Roeder*, 466 S.W.3d at 543.

Section 71.010 provides that municipal ordinances regulating "matters and things upon which there is a general law of the state . . . shall . . . [be] in conformity with the state

law upon the same subject." That is not to say that a municipality cannot adopt an ordinance in an area in which state law legislates. *Coop. Home Care*, 514 S.W.3d at 584. Rather, section 71.010 "is a general statute ensuring that state and local laws do not conflict." *Id.* "The test for determining if a conflict exists is whether the ordinance permits what the statute prohibits or prohibits what the statute permits." *Roeder*, 466 S.W.3d at 543-44 (internal quotation omitted).

Here, sections 71.625.2, RSMo Supp. 2012, and 408.020 provide for prejudgment interest at specific rates. Wentzville's ordinance permits the recovery of prejudgment interest, but at a different rate. The ordinance, therefore, conflicts with sections 71.625.2, RSMo Supp. 2012, and 408.020. Consequently, the trial court erred in awarding prejudgment interest to Wentzville in accordance with its interest ordinance rather than sections 71.625.2, RSMo Supp. 2012, and 408.020.

The trial court's prejudgment interest award to Aurora, Cameron, and Oak Grove pursuant to section 408.020 is reversed and, on remand, the trial court must calculate prejudgment interest in accordance with this opinion. The trial court's interest award to Wentzville is reversed. On remand, the trial court must calculate prejudgment interest for Wentzville in the same way it is to be calculated for Aurora, Cameron, and Oak Grove in accordance with this opinion.

## I. Postjudgment Interest

In its eighth point, CenturyLink asserts the trial court erred in awarding postjudgment interest to Wentzville at the rate of 18 percent per annum because Wentzville's ordinance is invalid to the extent the ordinance permits an award of

37

postjudgment interest above the nine percent permitted under section 408.040, RSMo Supp. 2012, the general postjudgment interest statute. But CenturyLink failed to preserve this argument for appellate review.

"An issue that was never presented to or decided by the trial court is not preserved for appellate review." *State ex rel. Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 129 (Mo. banc 2000). "Appellate courts are merely courts of review for trial errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court." *Barkley v. McKeever Enters., Inc.*, 456 S.W.3d 829, 839 (Mo. banc 2015).

In their post-trial brief, the Cities requested Wentzville's postjudgment to be calculated pursuant to the 18-percent-per-annum interest ordinance. CenturyLink did not challenge the Cities' reliance on Wentzville's ordinance as opposed to section 408.040, RSMo Supp. 2012.[17] Instead, CenturyLink raises this argument for the first time on appeal. Accordingly, it is not preserved for this Court's review.

## J. Attorney Fees

In its ninth point, CenturyLink contends the trial court erred in awarding the Cities attorney fees. In granting partial summary judgment, the trial court found CenturyLink's unlawful actions were willful under section 392.350 and ordered CenturyLink to pay attorney fees pursuant to sections 392.350, 488.472, and 527.100. In its final judgment,

---

[17] In its reply brief, CenturyLink asserts it preserved this issue for appellate review and cites to several portions of the trial transcript. Those portions of the transcript, however, do not specifically address postjudgment interest or the application of section 408.040, RSMo Supp. 2012, instead of Wentzville's interest ordinance.

the trial court again found the Cities were entitled to attorney fees under sections 392.350, 488.472, and 527.100 and awarded $1,190,610.77 in attorney fees and expenses.[18]

Missouri courts follow the American rule, "which provides that, absent statutory authorization or contractual agreement, each party bears the expense of his or her own attorney's fees." *Tupper*, 468 S.W.3d at 374. Section 488.472 provides:

> In case any telecommunications company shall do or cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or other thing required to be done by chapter 392,[19] or by any order or decision of the commission, such telecommunications company shall be liable to the person or corporation affected thereby for all loss, damage or injury caused thereby or resulting therefrom, and *in case of recovery, if the court shall find that such an act or omission was willful, it may, in its discretion, pursuant to section 392.350, fix a reasonable counsel or attorney's fee,* which fee shall be taxed and collected as a part of the costs in the action.

(Emphasis added). Section 392.350 contains identical language regarding an award of "reasonable counsel or attorney's fee" if the telecommunications company's "act or omission was willful."

Neither section 392.350 nor section 488.472 provides a definition for the term "willful." But Missouri courts have interpreted "willful" for purposes of section 392.350 to mean intentionally acting, knowing it was incorrect, or acting without any reasonable

---

[18] The trial court also relied on section 655.070 of Wentzville's municipal code and the trial court's equitable powers in awarding attorney fees.

[19] In its order of April 17, 2014, the trial court concluded the Cities were entitled to summary judgment on their claims that CenturyLink's failure to fully report all of their gross receipts was unlawful and subjected the Cities to undue and unreasonable prejudice under section 392.200. CenturyLink does not challenge the trial court's finding that its actions violated chapter 392. Rather, CenturyLink challenges only the trial court's findings that its actions were willful and, therefore, justified an award of attorney fees.

basis. *See Overman v. Sw. Bell Tel. Co.*, 706 S.W.2d 244, 257 (Mo. App. 1986); *De Paul Hosp. Sch. of Nursing, Inc. v. Sw. Bell Tel. Co.*, 539 S.W.2d 542, 549 (Mo. App. 1976).

The trial court determined CenturyLink acted willfully in its summary judgment order. The Cities asserted they were entitled to summary judgment because CenturyLink intentionally underreported and underpaid license taxes knowing it was unlawful. But this assertion was based on the Cities' premise that no categories of revenue could be excluded from gross receipts for purposes of calculating license taxes. According to this Court's holding *infra*, however, the ordinances do not cover all categories of CenturyLink's revenue.

The Cities further relied on the fact CenturyLink was aware of ongoing litigation throughout the state between municipalities and telephone companies and was even a named defendant in one case. The mere existence of other pending litigation between other cities and telephone companies, however, does not establish, as a matter of law, that CenturyLink intentionally acted, knowing it was wrong, or acted unreasonably in challenging the revenues on which it was required to pay license taxes to the Cities.

The Cities also asserted CenturyLink's disparate treatment of customers showed CenturyLink's treatment of the Cities was inconsistent and arbitrary. In doing so, the Cities rely on *De Paul Hospital*, 539 S.W.2d at 549-52. But CenturyLink's treatment of the Cities is distinguishable from the conduct found to be willful in *De Paul Hospital*.

In *De Paul Hospital*, a hospital's nursing school provided facility housing for nursing students and the friends and families of nursing students and patients. *Id.* at 544. The telephone company charged the hospital's housing facility the commercial rate for its

telephone services, not the lower, hotel-motel rate. *Id.* The hospital challenged the rate, and the telephone company was ordered to charge the hospital the lower, hotel-motel rate. *Id.* In a subsequent action, the hospital was awarded damages for overcharges, and the trial court awarded attorney fees on the basis the telephone company acted willfully. *Id.*

In affirming the award of attorney fees, the court of appeals reasoned it would not hesitate to find a utility's discriminatory practices willful when "the utility has been inconsistent and arbitrary in applying its own rate tariffs." *Id.* at 552. The court of appeals noted that, each time the hospital pointed out it met the requirements for the hotel-motel rate, the utility shifted its position and asserted new criteria for the hotel-motel rate. *Id.* It further relied on the fact that the utility denied the hospital the hotel-motel rate based on assumptions about the housing facility while extending the favored rate to other similarly situated facilities that did not meet the criteria it applied to the hospital. *Id.* Based on this arbitrary and inconsistent treatment, the court of appeals concluded the utility's actions could be found to have no reasonable basis and, therefore, were willful for purposes of section 392.350. *Id.*

Here, the Cities contend CenturyLink acted arbitrarily and inconsistently because it paid taxes on revenue from vertical services in at least one city but not others with similar ordinances and failed to enter into right-of-way user agreements in some cities while doing so in others. CenturyLink counters by claiming it paid license taxes uniformly based on the services taxable under each city's respective ordinance and entered into right-of-way user agreements when required.

41

Even if CenturyLink acted inconsistently by paying taxes in one city but not others, this conduct does not meet the definition of "willful" in *De Paul Hospital*. First, *De Paul Hospital* established the definition of "willful" in the context of rate discrimination, noting a consumer is required to pursue his or her claim of being overcharged by a utility in a proceeding when the consumer is greatly overmatched by the utility. *Id.* at 549. The case here involves whether taxes were due and is not a challenge to utility rates.

Additionally, *De Paul Hospital* does not stand for the principle that all arbitrary and inconsistent actions are willful. *Id.* Rather, the conduct of the telephone company in *De Paul Hospital* that was characterized as arbitrary and inconsistent was charging similarly situated facilities a more favorable rate while simultaneously charging the hospital a higher rate and, on multiple occasions, changing the criteria it established for the more favorable rate after the hospital complied with the criteria. *Id.* at 552. The arbitrary and inconsistent conduct of the telephone company was evidence of willfulness because the actions showed the telephone company was intentionally discriminating against the hospital.

Here, the fact CenturyLink paid taxes on revenue from vertical services in at least one city but not others, although inconsistent, is not of the same nature as "intentionally charging an incorrect rate knowing it was incorrect, or charging a rate when the utility has no reasonable basis for placing the individual consumer within the classification calling for that rate." *Id.* at 549. Evidence that CenturyLink paid taxes to one city but not others, without more, is insufficient to support the trial court's finding that CenturyLink's failures to pay taxes were unlawful, willful actions. Accordingly, the trial court erred in awarding attorney fees pursuant to sections 392.350 and 488.472.

42

Similarly, the record does not support an award of attorney fees pursuant to section 527.100. Section 527.100 provides that, in a declaratory judgment action, "the court may make such award of costs as may seem equitable and just." Missouri courts have interpreted section 527.100 to permit an award of attorney fees. *See Smith v. City of St. Louis*, 395 S.W.3d 20, 26 (Mo. banc 2013). Attorney fees may be awarded under section 527.100 when there are "special circumstances." *Id.* Special circumstances for purposes of attorney fees in declaratory judgment actions "are narrowly construed" and will not be awarded when parties are merely "advocat[ing] inconsistent legal and factual positions." *Id.*; *see also Incline Village Bd. of Trs. v. Edler*, No. SC97345, 2019 WL 1912218, at *6 (Mo. banc Apr. 30, 2019). Courts have found special circumstances when "a common fund or collateral litigation resulted" from a defendant's actions and in declaratory judgment actions when intentional misconduct has been shown. *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 286 (Mo. banc 2019). The Cities did not raise any of these grounds for attorney fees in their motions for summary judgment or on appeal.

This declaratory judgment action involved a dispute as to CenturyLink's liability for the Cities' respective license tax and right-of-way ordinances. The parties disputed the meaning of the Cities' ordinances and which revenues were taxable thereunder. The parties further disputed the requirements under the Cities' right-of-way ordinances and the legality of requiring CenturyLink to enter into user agreements. In other words, the parties were simply advocating inconsistent legal and factual positions as to whether CenturyLink was required to pay license taxes or enter into user agreements under the Cities' ordinances.

Such circumstances do not establish the Cities were entitled to attorney fees pursuant to section 527.100.

The trial court also found the Cities were entitled to attorney fees under its equitable powers. On rare occasions, attorney fees may be awarded "where a court of equity finds it necessary to award them in order to balance benefits, but this occurs only if 'very unusual circumstances' can be shown." *Washington Univ. v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 469 (Mo. App. 1990). The Cities assert this case presented unusual circumstances because CenturyLink violated the trial court's orders to produce revenue information and the litigation was complex and complicated because of CenturyLink's behavior. The Cities claim CenturyLink's "blatant disregard" for the trial court's discovery orders qualifies as a special circumstance sufficient to authorize the award of attorney fees. In support, the Cities cite *Birdsong v. Children's Division, Missouri Department of Social Services*, 461 S.W.3d 454, 461 (Mo. App. 2015). *Birdsong* is unavailing. It merely recognized special circumstances exist where disregard for a court's orders necessitates collateral litigation. *Id.* at 462. CenturyLink's recalcitrance during discovery did not necessitate collateral litigation. And while it might have subjected CenturyLink to an award of attorney fees as a sanction under Rule 61, it is not a basis for awarding attorney fees otherwise.

Furthermore, "fees are only warranted in unusual or extremely complicated cases in which the parties have had to take novel legal actions to achieve a result." *Lipic v. State*, 93 S.W.3d 839, 843 (Mo. App. 2002) (internal quotation omitted). Although this is a complicated case, the record does not reflect the Cities took any novel legal actions under

44

the facts and circumstances of this case. Accordingly, the trial court erred in awarding attorney fees under its equitable powers.

As a result, the only basis remaining for the award of attorney fees is Wentzville's municipal code. Because CenturyLink did not challenge the attorney fee award pursuant to Wentzville's ordinance, the attorney fees awarded to Wentzville must be affirmed. The portion of the judgment awarding attorney fees to Aurora, Cameron, and Oak Grove is reversed.

### III. The Cities' Cross-Appeal

### A. Adequate Notice of Issues to Be Tried

In their first point, the Cities assert the trial court erred in entering a final judgment inconsistent with its prior grant of partial summary judgment, which the Cities believe was a binding determination CenturyLink was liable for license taxes in each city on the entirety of its gross revenues. Additionally, the Cities contend they were prejudiced because the trial court failed to provide them with adequate notice and an opportunity to respond to the reopened issue of liability. Similarly, in their second point, the Cities assert the trial court erred in admitting evidence of CenturyLink's liability because such evidence was irrelevant and beyond the scope of trial in that CenturyLink's liability had already been determined on summary judgment and the trial court had ordered the trial to be limited to the amount of damages on CenturyLink's gross revenue in each city.

In its April 6, 2016 order, the trial court found:

Defendants are liable for license taxes to each City for all revenue they receive *in that respective City*. Defendants are in the business of furnishing exchange telephone service in Aurora and Cameron and supplying telephone

45

> service in Oak Grove and Wentzville. Defendants are not in any other business in those Cities. Accordingly Defendants must pay license taxes in each City on all revenues *in such City* specified in the Court's Order of June 2, 2014 and all other revenue *in such City*.

(Emphasis added). The April 6, 2016 order, therefore, found CenturyLink liable for unpaid license taxes for all revenue received in each respective city. While it specified the taxable revenues included those listed in the June 2, 2014 order, it qualified such statement with "in such City." Although the order determined CenturyLink's liability for unpaid license taxes, that liability was limited to the revenues derived from services in each city.

This is evidenced by the trial court's ruling on the Cities' objection at trial that CenturyLink was trying to relitigate liability. In overruling the objection, the trial court stated: "I think that's what we're trying to determine now, what is all the revenue . . . [i]n the cities." The trial court, likewise, overruled the Cities' further objections that its previous summary judgment orders had already determined that all revenue sources were taxable and that the revenue information CenturyLink provided in discovery allocated all revenue to a particular city. Accordingly, neither the April 6, 2016 order nor the record reflects that the trial court determined, prior to trial, which revenues were derived from services in each city.

Furthermore, even if the trial court's April 6, 2016 summary judgment order could be read to establish CenturyLink was liable for the various revenue streams, the order was one of partial summary judgment. Partial summary judgment orders are merely interlocutory and can "be added to, amended, or set aside by the court at any time prior to final judgment." *Shelter Mut. Ins. Co. v. Vulgamott*, 96 S.W.3d 96, 104 (Mo. App. 2003);

46

*see also Quick v. Anderson*, 503 S.W.3d 242, 249 (Mo. App. 2016) (holding that partial summary judgment orders remain interlocutory, and thereby amendable, until a final judgment is entered). Accordingly, any perceived inconsistency between the trial court's April 6, 2016 partial summary judgment order and its final judgment is inconsequential.

The Cities contend the alleged "reopening" of the liability issue was of consequence prejudicing them at trial because they had no prior notice and, therefore, were denied an opportunity to prepare and present evidence regarding which revenue streams were derived from within the Cities. But the record reflects otherwise.

It is evident from the record CenturyLink and the Cities interpreted the trial court's "liability" determination differently. CenturyLink interpreted the partial summary judgment orders to establish it was liable for the unpaid license taxes derived from its business within the Cities but leaving open the issue as to which revenues were, in fact, derived from the Cities. The Cities, however, believed the trial court, in determining liability, resolved that all the disputed revenue sources were derived from services CenturyLink furnished in the Cities.

The Cities' actions show they were aware, prior to the trial, that CenturyLink believed the summary judgments did not resolve the issue of which revenue categories were derived from services in the Cities. A week before trial, the Cities filed a motion *in limine* seeking to preclude CenturyLink from "offering evidence or argument regarding issues of license tax liability," including the revenues earned in each city. In their motion, the Cities stated CenturyLink has "indicated [it] may seek to introduce evidence regarding liability, including which of their revenue is 'in the Cities' and how categories of

telecommunications services relate to the language in the Cities' taxes." In its response to the motion *in limine*, CenturyLink pointed out the trial court had denied the Cities' request to grant summary judgment as to damages and asserted the purpose of the trial was to address the revenue derived from each respective city and the amount of tax owed as a result. The Cities did not obtain a ruling on their motion *in limine* prior to trial. Instead, on the morning of trial, the trial court stated it would rule on the Cities' objections to evidence on liability as made during the trial.

This record reflects that, prior to trial, there was disagreement between the parties as to whether the trial court's partial summary judgment order established which revenues were derived from the Cities or whether that issue would be litigated at trial. The record further indicates the Cities were aware of that disagreement in advance of trial and of CenturyLink's intent to introduce evidence as to which revenues were derived from within the Cities. The Cities could not assume a favorable ruling on their motion *in limine.* Rather, the Cities had notice they should be prepared to present or, at the very least, counter evidence at trial regarding whether the revenues were derived from CenturyLink's business in the Cities.

Accordingly, the record does not support the Cities' assertions they lacked adequate notice that the issue of which revenues were derived from the Cities would be tried. It follows no error resulted from the trial court permitting and considering at trial evidence as to which revenues were derived from services furnished in the Cities.

**B. Carrier Access Revenue and Wentzville's Interstate Telephone Calls**

In their third point, the Cities assert the trial court erred in finding that carrier access revenue from services in all the Cities and revenue derived from interstate telephone calls in Wentzville are not taxable because such decision erroneously applied the law and was not supported by the evidence.[20] This Court will affirm a judgment in a court-tried case "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012).

The Cities contend the trial court misapplied the law by finding the carrier access revenues from all Cities and Wentzville's interstate telephone call revenue were not taxable under the Cities' respective ordinances in that prior precedent establishes the term "gross receipts" encompasses all receipts without deductions. But the Cities' contentions take this Court's prior decisions out of context and ignore the qualifying language in their respective ordinances as to the source of such receipts.

First, the Cities are correct that this Court has defined "gross receipts" as "the whole and entire amount of the receipts without deduction." *Ludwigs v. City of Kan. City*, 487 S.W.2d 519, 522 (Mo. 1972); *Kan. City v. Graybar Elec. Co.*, 485 S.W.2d 38, 40 n.4 (Mo. banc 1972); *Laclede Gas Co. v. City of St. Louis*, 253 S.W.2d 832, 835 (Mo. banc 1953);

---

[20] This point is multifarious, as it contains more than one basis for reversal. *Bowers v. Bowers*, 543 S.W.3d 608, 615 n.9 (Mo. banc 2018). Multifarious points preserve nothing for appellate review because they fail to comply with Rule 84.04(d). *Id.* This Court, however, has discretion to review, *ex gratia*, multifarious points on the merits and elects to exercise that discretion in reviewing this point relied on. *Id.*

*see also Suzy's Bar & Grill, Inc. v. Kan. City*, 580 S.W.2d 259, 262 (Mo. banc 1979) (stating "a gross-receipts-occupational-license tax starts with the revenue received by the licensee . . . and assesses a tax equal to a percentage of those revenues without regard to the makeup of the revenue and without restrictions to the percentage stated in the taxing ordinance"). None of these cases, however, addressed gross receipts in the context of whether they were derived from services within the city. Rather, these cases addressed whether a tax was an occupational tax versus a sales tax, *Suzy's Bar*, 580 S.W.2d at 260, whether the cost of license taxes passed onto the customers should be considered part of a company's gross receipts, *Ludwigs*, 487 S.W.2d at 522-23, and whether "gross receipts," as used in a municipal ordinance, included monies a company collected during a rate dispute and later refunded to its customers, *Laclede Gas*, 253 S.W.2d at 851.

Here, while the ordinances speak in terms of "gross receipts," that language is qualified. Aurora's and Cameron's license tax ordinances provide:

> Every person, firm, company or corporation now or hereafter engaged in the business of furnishing exchange telephone service in the City . . . shall pay the said City as an annual license tax, [a fixed percentage] of the gross receipts *derived from the furnishing of such service within said City*, as hereinafter set forth.

(Emphasis added). Aurora's and Cameron's license tax ordinances, therefore, tax only gross receipts "derived from the furnishing of such service within said City." The license tax ordinances of Oak Grove and Wentzville provide:

> Every person . . . engaged in the business of supplying . . . telephone service . . . for compensation . . . *in the City* . . . shall pay to the City . . . a license tax of . . . five percent (5%) of the gross receipts from *such business*.

50

(Emphasis added). Accordingly, the Oak Grove and Wentzville license tax ordinances tax gross receipts "from such business." "Such business" refers back to the business of supplying telephone service "in the City." The Oak Grove and Wentzville license tax ordinances, therefore, similarly apply only to gross receipts from business in those Cities.

The Cities' interpretation ignores this limitation in their ordinances. But Missouri courts must give all words, clauses, and phrases of an ordinance meaning. *Barry Simon Dev., Inc. v. Hale*, 210 S.W.3d 312, 317 (Mo. App. 2006). Therefore, the trial court did not erroneously misapply the law when it analyzed whether CenturyLink's revenue sources were derived from business within the Cities.

The Cities further assert that, even if the trial court properly analyzed the revenues separately, there was not substantial evidence to support its finding that carrier access revenues are not derived from services in the Cities. The Cities, however, ignore that it was their burden – not CenturyLink's – to prove the revenues that were subject to taxation under their respective license tax ordinances. "In a declaratory judgment action the burden of proof rests, as in the usual course, on the party who asserts the issue according to the cause of action." *Shaffer v. Terrydale Mgmt. Corp.*, 648 S.W.2d 595, 609 (Mo. App. 1983). The Cities sought a declaration that, under their respective ordinances, the entirety of CenturyLink's gross revenue from services related to each city was taxable revenue. As the proponent, the Cities had the burden of proof. The trial court was free to be unpersuaded that the Cities met this burden of proof as to carrier access revenue and could make that determination solely because it disbelieved the Cities' evidence. *See White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010).

51

The Cities attempt to place the burden on CenturyLink by asserting the exclusion of carrier access and interstate revenue constitute exemptions that CenturyLink, as the taxpayer, had the burden of proving applied. *See Fenix Constr. Co. of St. Louis v. Dir. of Revenue*, 449 S.W.3d 778, 780 (Mo. banc 2014). But the trial court did not find carrier access and interstate revenue were exempt from the Cities' license tax base. Rather, in construing the Cities' respective ordinances and hearing evidence as to where the revenue is derived, the trial court determined those revenue sources were not within the Cities' tax bases. Accordingly, the trial court did not err in finding revenues from carrier access services in all the Cities and from interstate telephone calls in Wentzville are not taxable.

### C. Exhibit U2

In their fourth point, the Cities assert the trial court erred in admitting exhibit U2 into evidence because it was inadmissible hearsay. In doing so, the Cities contend exhibit U2 had to satisfy a number of foundational requirements "including relevancy, authentication, the best evidence rule, and hearsay." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 615 (Mo. banc 2006). In particular, the Cities assert that "[a] summary of voluminous records is admissible in evidence provided that the competency of the underlying records is first established and such records are made available to the opposite party for cross-examination purposes." *Id.* at 616.

The Cities, however, never objected that exhibit U2, as a summary exhibit, was inadmissible on foundational or hearsay grounds. Instead, the only objection the Cities raised was that "CenturyLink has never produced their actual payment data" despite being compelled to do so during discovery and that the amounts in exhibit U2 "are different

52

amounts than the amount that they have produced all along." The trial court overruled the objection, acknowledging it would see various damages calculations and it would have to figure out which was the most reasonable under the given facts and circumstances. The Cities, therefore, never asserted in the trial court that exhibit U2 amounted to hearsay because CenturyLink failed to comply with the requirements for admission of a summary of voluminous records. Rather, the objection revolved around what CenturyLink produced during discovery.

"To properly preserve a challenge to the admission of evidence, the objecting party must make a specific objection to the evidence at the time of its attempted admission." *St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 125 (Mo. banc 2013). On appeal, a party cannot "broaden the objection presented to the circuit court." *State v. Tisius*, 362 S.W.3d 398, 405 (Mo. banc 2012). Because the Cities cannot broaden their objection on appeal, they failed to properly preserve this point of error for appellate review. *Id.*

### D. Amount of Damages

In their fifth point, the Cities assert multiple claims of error with respect to the amount of damages awarded pursuant to exhibit U2. Those claims include: (1) the trial court should have assessed damages based on CenturyLink's disclosed revenue, all of which it admitted was attributable to the Cities; (2) the trial court's award of damages did not include carrier access receipts and interstate receipts; (3) "even if it were proper to exclude carrier access and 'interstate' in Wentzville, there was insufficient evidence regarding such exclusions in Exhibit U2, Scenario 2"; (4) "even if there were an exemption

from taxation for receipts from carrier access and 'interstate,' there was insufficient evidence to establish [CenturyLink's] right to such exemption"; and (5) the trial court improperly excluded revenue CenturyLink admitted was attributable to Oak Grove.

Again, a point that contains more than one basis for reversal is multifarious. *Bowers*, 543 S.W.3d at 615 n.9. Multifarious points preserve nothing for appellate review because they fail to comply with Rule 84.04(d). *Id.*

Although this Court has the discretion to review multifarious points on the merits, *id.*, the Cities attempt to raise five different errors, most of which incorporate or relate back to other points this Court has already rejected. This is evidenced by the Cities' repeated references to its prior points relied on and sparse reliance on any additional legal authority throughout the analysis. This Court refuses to comb through this point to decipher what, if any, of these arguments are distinguishable from those raised in the Cities' previous points.

Nevertheless, it is clear the Cities take issue with the damages calculations and alleged lack of supporting documentation for such numbers in CenturyLink's exhibit U2. In doing so, the Cities contend CenturyLink made judicial admissions as to the amount of damages that were attributable to each city. They contend CenturyLink is bound by its witnesses' testimony on such matters of fact "because a party's testimony may be of such a character as to have all the force and effect of a judicial admission by which he is bound notwithstanding the testimony of other witnesses to the contrary." *Steward v. Baywood Villages Condo. Ass'n*, 134 S.W.3d 679, 683 (Mo. App. 2004) (internal quotation omitted).

CenturyLink, however, is a corporation, and there is no indication in the record that the witnesses testifying on CenturyLink's behalf were corporate representatives such that their testimony would be binding on CenturyLink. Accordingly, any factual admissions by those witnesses do not amount to judicial admissions by which CenturyLink is bound for purposes of damages calculations.

The remainder of the Cities' arguments are couched in terms of whether there was sufficient evidence to support the damages award. In doing so, the Cities challenge the evidence offered by CenturyLink – particularly exhibit U2 – and contend CenturyLink failed to adequately explain what was included in the excluded revenue types – such as what constituted interstate revenue in Wentzville. But the Cities, not CenturyLink, bore the burden of proof as to damages. *See Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 731 (Mo. App. 2014) ("The party claiming damages bears the burden to establish the existence and amount of damages within a reasonable degree of certainty."). CenturyLink, therefore, was not required to present any evidence as to what constituted interstate revenue in Wentzville. Accordingly, the Cities fail to establish the trial court's damages award was erroneous.

### E. Credit of Payments Made under Protest

In their sixth point, the Cities assert the trial court erroneously applied the law when it credited CenturyLink for payments CenturyLink made under protest pursuant to section 139.031, RSMo Supp. 2012, and, as a result, deprived the Cities of damages and interest to which they were entitled. The Cities contend the payments made under protest should not be credited because CenturyLink did not introduce any evidence of the alleged monthly

55

payments or that they complied with all the protest requirements of section 139.031, RSMo Supp. 2012. The Cities further emphasize they are unable to use the payments while the cases protesting the amounts owed under the Cities' license tax ordinances remain pending.

But CenturyLink did, in fact, introduce evidence regarding the amount of protest payments as part of exhibit U2. The Cities disregard this evidence, however, because they contest the admissibility of exhibit U2. As previously discussed, the Cities' challenges to the admissibility of exhibit U2 raised on appeal were not preserved, and the Cities made no objection to exhibit U2 on grounds it inaccurately reflected the protest payment amounts.

The Cities further claim CenturyLink failed to establish it complied with section 139.031, RSMo Supp. 2012, when it made the protest payments. But the Cities make no allegations that CenturyLink failed to comply with section 139.031, RSMo Supp. 2012, in making the protest payments or that the protest payments were, in fact, inaccurate. Rather, the Cities' main focus is that, by not awarding them such amounts as part of their damages in this action, the Cities cannot collect interest on such payments. Under section 139.031, RSMo Supp. 2012, however, a taxpayer "is not liable for interest or penalties during the impoundment even though he fails in his protest and even though the [entity] cannot use the tax money in the interim." *Boyd-Richardson Co. v. Leachman*, 615 S.W.2d 46, 49 (Mo. banc 1981).

The Cities contend such case law is inapplicable because this is not a tax protest case. But permitting the collection of interest on protest payments to which the Cities would not otherwise be entitled merely because the credit is being given in a separate action

would go against the purpose for the trial court awarding the credit – to prevent inconsistent results between this action and the protest actions.

Additionally, the trial court's judgment orders CenturyLink to release the payments made under protest within 10 days of the judgment becoming final and dismiss the protest actions with prejudice. It then lists the protest actions currently pending. It is inherent in the trial court's judgment, therefore, that the credit is contingent on CenturyLink's dismissal of the protest actions. CenturyLink does not challenge the trial court's directive with respect to the dismissal, with prejudice, of the protest actions. Accordingly, the Cities have failed to establish the trial court misapplied the law when it credited the protest payments to CenturyLink.

### F. Failure to Impose Penalties

In their seventh and eighth points, the Cities contend the trial court erred in failing to impose penalties for CenturyLink's failure to comply with the Cities' license tax ordinances and Cameron's right-of-way ordinances. The Cities assert their respective ordinances require the award of penalties for delinquent taxes and Cameron's right-of-way fees because the ordinances use the word "shall" regardless of a finding of intent on behalf of CenturyLink. But CenturyLink avers sections 71.625.2, RSMo Supp. 2012, and 144.250, RSMo Supp. 2012, control and prohibit an award of penalties absent a finding of willful neglect, evasion, or fraudulent intent.

Section 71.625.2, RSMo Supp. 2012, provides the "penalty provisions of section 144.250[, RSMo Supp. 2012,] relating to delinquent sales taxes shall apply to delinquent

taxes due as a result of the imposition of a license tax by any municipal corporation."

Section 144.250.2, RSMo Supp. 2012, provides:

> In case of failure to pay the full amount of tax required under sections 144.010 to 144.525 on or before the date prescribed therefor, determined with regard to any extension of time for payment, *unless it is shown that such failure is due to reasonable cause and not the result of willful neglect*, evasion or fraudulent intent, there shall be added to the tax an amount equal to five percent of the deficiency.

(Emphasis added). Under section 144.250.2, RSMo Supp. 2012, therefore, a taxpayer can avoid the penalty deficiencies by a showing of reasonable cause and an absence of willful neglect. *Conagra Poultry Co. v. Dir. of Revenue*, 862 S.W.2d 915, 919 (Mo. banc 1993).

By taking the taxpayer's intent into consideration for purposes of accessing a penalty, sections 71.625.2 and 144.250.2, RSMo Supp. 2012, conflict with the Cities' ordinances, which state that a penalty "shall" be imposed without any regard to the taxpayer's intent. When a municipal ordinance conflicts with a state statute, the ordinance is void. *Roeder*, 466 S.W.3d at 543.

The Cities attempt to avoid this conflict by asserting section 71.625.2, RSMo Supp. 2012, became effective after it filed this action and cannot be applied retrospectively. But, as previously discussed, the legislature can "waive or impair the vested rights of political subdivisions, such as cities, without violating the prohibition on retrospective laws." *Mo. Mun. League*, 489 S.W.3d at 768. Additionally, a conflicting municipal ordinance "is void because the powers granted a municipality must be exercised in a manner not contrary to the public policy of the state and any provisions in conflict with prior or *subsequent* state

58

statutes must yield." *Roeder*, 466 S.W.3d at 557 (emphasis added) (internal quotation omitted).

Furthermore, Missouri's prohibition against retrospective laws "does not mean that no statute relating to past transactions can be constitutionally passed, but rather that none can be allowed to operate retrospectively so as to affect such past transactions to the substantial prejudice of parties interested." *State ex rel. Clay Equip. Corp. v. Jensen*, 363 S.W.2d 666, 670 (Mo. banc 1963). Remedial statutes do not affect substantive rights and, therefore, do not operate retrospectively. *Hess*, 220 S.W.3d at 769. And while "[l]aws that provide for penalties where none existed before . . . are substantive and are always given only prospective application," *id.*, a law that simply modifies the type or amount of penalty is remedial in nature. *Essex Contracting, Inc. v. Jefferson Cty.*, 277 S.W.3d 647, 655 (Mo. banc 2009).

Section 71.625.2, RSMo Supp. 2012, therefore, can be applied retroactively.[21] Accordingly, the municipal ordinances under which the Cities seek penalties for CenturyLink's failure to pay all of its license taxes are inapplicable under the facts and circumstances of this case.

The Cities further assert the trial court erred in failing to impose penalties for CenturyLink's failure to pay linear foot fees under Cameron's right-of-way code. The Cities maintain the trial court lacked discretion to decline to impose penalties on

---

[21] The Cities do not alternatively assert the trial court erred by failing to award penalties against CenturyLink under sections 71.625.2 and 144.250.2, RSMo Supp. 2012.

59

CenturyLink because section 10.5-59 of Cameron's municipal code made such penalties mandatory. Section 10.5-59 states: "Any person found guilty of violating, disobeying, omitting, neglecting or refusing to comply with any of the provisions of this article *shall* be fined five hundred dollars ($500.00) for each offense." (Emphasis added). CenturyLink contends the trial court properly declined to impose penalties because the proceedings below were not conducted pursuant to the rules of criminal procedure.

Pursuant to Rule 37.34, "All ordinance violations shall be prosecuted by information." Further, "[t]he rules of criminal procedure apply to prosecution of municipal ordinances, including the criminal standard of proof beyond a reasonable doubt." *Damon v. City of Kan. City*, 419 S.W.3d 162, 188 (Mo. App. 2013); *see also City of Moline Acres v. Brennan*, 470 S.W.3d 367, 380 (Mo. banc 2015) ("[T]he power to inflict the penalty imposed by the ordinance cannot be exercised until there has been a ***judicial determination*** of the fact that the ordinance has been violated. . . . [B]efore there can be such a 'judicial determination,' due process requires that the City must prove the defendant's guilt beyond a reasonable doubt." (internal quotations omitted)). Given that Cameron neither prosecuted CenturyLink's alleged ordinance violations by information nor established CenturyLink's guilt beyond a reasonable doubt, the trial court did not err in refusing to impose penalties for CenturyLink's failure to pay linear foot fees under Cameron's right-of-way code.

### G. Attorney Fees on Appeal

Finally, the Cities filed a motion with this Court seeking an award of attorney fees on appeal. But "the entitlement to attorneys' fees on appeal stands upon the same ground as that at the trial court level." *Vogt v. Emmons*, 181 S.W.3d 87, 97 (Mo. App. 2005).

Because this Court finds only Wentzville is entitled to attorney fees for trial work, this Court cannot award attorney fees to the other Cities on appeal. Accordingly, this Court sustains the Cities' motion for attorney fees as to Wentzville and remands the issue to the trial court to hear evidence and determine the reasonableness of the fees Wentzville requests. The motion for attorney fees on appeal, however, is overruled with respect to Aurora, Cameron, and Oak Grove.

## IV. Conclusion

The trial court erred in awarding prejudgment interest pursuant to section 408.020 to Aurora, Cameron, and Oak Grove; erred in awarding prejudgment interest to Wentzville pursuant to its ordinance; and erred in awarding attorney fees to Aurora, Cameron, and Oak Grove pursuant to sections 392.350, 488.472, 527.100 and the court's equitable powers. The judgment is reversed in these respects but affirmed in all others. The Cities' motion for attorney fees on appeal is sustained as to Wentzville but overruled as to Aurora, Cameron, and Oak Grove. The cause is remanded. On remand, the trial court must calculate prejudgment interest in accordance with this opinion, determine what portion of the trial court's attorney fee award may be properly apportioned to Wentzville, and determine Wentzville's attorney fees on appeal.

_____
PATRICIA BRECKENRIDGE, JUDGE

Draper, C.J., Wilson, Russell, Powell,
and Stith, J., concur; Fischer, J., concurs
in result only.

61